UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUDREY PRUITT,

    Petitioner,                                          Case No. 2:15-cv-10812

v.                                                        HONORABLE STEPHEN J. MURPHY, III

ANTHONY STEWART,

    Respondent.
                                         /

**OPINION AND ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

The case sounds in habeas under 28 U.S.C. § 2254. Petitioner Audrey Devonne Pruitt challenges her convictions for arson of a dwelling house, burning of insured property, and insurance fraud. At the time she filed the petition, Pruitt was in the custody of the Michigan Department of Corrections. She has since been unconditionally discharged from custody.[1] She claims that the trial court erred in admitting expert witness testimony regarding the cause of the fire, trial counsel was ineffective in failing to object to the expert witness's testimony, and that offense variable 19 was incorrectly scored. Respondent argues that the claims are procedurally defaulted, not cognizable on habeas review and are without merit. For the reasons below, the Court will deny habeas relief.

## BACKGROUND

Pruitt's convictions arise from a fire at her home in Buena Vista Township in

---

[1] Pruitt's discharge does not defeat § 2254's "in custody" requirement because the requirement is satisfied as long as a petitioner was incarcerated at the time a petition is filed. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

1

November 2009. The Michigan Court of Appeals described the circumstances leading to Petitioner's convictions as follows:

> In December 2008, Mary Liddell sold defendant a home located in Buena Vista Township, Michigan. Defendant purchased the home on a $9,000 land contract, putting $700 down and making payments of $350 per month. The land contract required defendant to obtain renter's insurance and Liddell to maintain her homeowner's insurance on the property. The contract also indicated that if anything happened to the home, defendant would not receive any proceeds from Liddell's insurance. While the land contract did not require defendant to obtain homeowner's insurance, she nonetheless entered into a homeowner's insurance policy with State Auto Insurance (State Auto) on September 4, 2009, insuring the home for $87,000 and personal property for $60,900.
>
> Two months later, on November 10, 2009, the home caught fire. Diana Diaz, who lived across the street from defendant, was looking through her living room window when she saw defendant's truck go by and then saw smoke billowing from defendant's roof. Diaz called 911. Patrick Brown, who resided next to Diaz, was outside smoking a cigarette on the morning of the fire and saw defendant drive to a stop sign at the end of the street. Brown went inside, got something to eat, and when he came back out, saw smoke coming from defendant's home.
>
> Another neighbor, David Thomas, was also outside that morning when he looked up and saw black smoke coming from defendant's home. As Thomas started toward defendant's home, he saw defendant driving down the street. Thomas ran toward defendant's car and tried to get her attention by yelling her name and waving, but defendant kept driving. Thomas then walked over to Diaz, who was in her front yard and confirmed that she had already called 911. According to Thomas, fire trucks arrived 10 to 15 minutes later.
>
> Firefighters received a call from dispatch at 9:37 a.m. and arrived at defendant's home at 9:53 a.m. Upon arrival, grayish-brown smoke was escaping from eaves and soffits of defendant's home, suggesting that a "heavy working structure fire" was inside. According to one of the firemen, the fire had spread to the living room along the ceiling but was most intense along the back wall of the kitchen between the refrigerator and the stove; a burnt "v" pattern on the wall at that location indicated the fire's point of origin. The firefighters extinguished the fire and the fire captain conducted an investigation of the property that same day.
>
> Fire Captain Craig Gotham, qualified as an expert in fire cause and origin, testified that he investigated the cause of the fire after it was extinguished. He testified that he ruled out accidental causes because the refrigerator's electrical wiring and the stove's gas fitting were "clean." He found a can of aerosol starting fluid (ether) by a loveseat that was burnt at its spray-nozzle. Gotham

also testified that he talked to defendant on the day of the fire. She told him that she left her home around 9:30 that morning to go shopping with her mother and that she had cooked breakfast sandwiches approximately an hour earlier. She also indicated that she did not smoke or use incense or candles.

Keith LaMont, a Michigan State Police forensic analyst, testified that he tested some charred remains taken from the home, but found no ignitable liquid within the samples. LaMont explained that ignitable liquid, such as the starter fluid found in defendant's home, could have been used but been completely consumed by the fire. This was because the ether contained in the starter fluid found at the scene was "very volatile" and could either evaporate or be quickly consumed by the fire, thereby decreasing the likelihood of its detection.

David Row .... was qualified as an expert in the field of fire investigation. Row testified that there are "four processes" used in conjunction to establish the origin of the fire, including witness information, burn pattern analysis, arc mapping, and fire dynamics evaluation.[ ] Row indicated that he began his investigation by questioning defendant regarding her activities on the day of the fire.[4] Row said that defendant told him that she left the home around 9:30 on the morning of the fire. Row also took into consideration the observations of Diaz.

> [4]Row said he asked defendant a multitude of questions, including: whether she had turned everything off when she left the home, had poured grease into the trashcan, or had had any circuit breaker trips recently; whether there had been any problems with the stove; whether she had to use a match to light the pilot, and; whether there were candles or incense in the home.

Row then recounted to the jury his visual observations of the exterior and interior of the home, displaying photographs he had taken during his investigation. He testified that both the gas and electric meters were intact and that neither could have caused the fire. Row said that, once inside the home, he systematically went through the rooms and observed evidence of fire damage. According to Row, he was able to rule out certain rooms as the origin of the fire based on the level of damage to personal belongings in the rooms. Based on his observations of low-level burn damage in the kitchen, Row testified that the origin of the fire was an empty "Rubbermaid or Hefty style 33 gallon" garbage can between the stove and refrigerator at or near floor level. The fire damage in this area extended all the way to the floor, where the trashcan had "melted down into a big blob of plastic." Row testified that analysis of the refrigerator cord indicated that it was not the cause of the fire.[5]

> [5]Jason McPherson, qualified as an expert in the field of electrical engineering, testified that he assisted Row with the origin and cause

3

study by evaluating the power cord to the refrigerator. According to McPherson, the cord showed no signs that it was the origin of the fire; rather, the condition of the cord merely indicated that it had been burnt by the fire.

Having determined the origin of the fire, Row explained that his next task was to determine its cause. Row testified that two considerations are relevant in this regard, including what material was ignited and what ignition source is hot enough to start the fire, as well as witness statements. Row then stated:

> So in this particular case, what I believe was ignited was the trashcan and whatever contents there may have been in the trashcan. This is a pretty thick plasticized material. I've done quite a bit of testing on these garbage cans to see, you know, how easily they burn versus, you know, how difficult it is to keep them burning, and part of it depends on what was put inside the trashcan in order to help the trashcan catch fire.
>
> But the biggest issue in this particular circumstance is that I have been able to, by my process of elimination here, and by my scientific methodology that I've followed, I have been able to establish that there is no electrical, mechanical or chemical causation for this fire, so the only other plausible explanation is there had to be some kind of an introduction of an open flame to this trashcan and the contents of this trashcan in order for it to be able to ignite.

Row then repeated that defendant told him she left her home at 9:30 a.m. and that Diaz saw smoke emanating from the home's soffit area as defendant drove away. Row then explained:

> Now, this is a 1,090 square foot house.... So I'm going to give them the benefit of the doubt and say this is approximately 9,000 cubic feet of air that now has to be displaced with smoke to the point where the smoke is now under pressure and it's forcing itself out through the eaves....
>
> So, what then could generate 9,000 cubic feet of smoke in that short of a period of time? And based upon my observations of where the origin of the fire is and what the causation of the fire is, i.e. an open flame application to the trashcan, that trashcan could not have generated 9,000 cubic feet of smoke in the time it would have taken her to basically get into her car and drive down the street.... It just isn't physically possible.
>
> ... [T]he fire would have had to have been in progress generating that kind of smoke at the time when [defendant] left the house....

On February 9, 2010, defendant submitted a claim to State Auto, estimating the

amount of loss from the fire at $118,035 and claiming $500.[ ] State Auto deemed this statement of loss inadequate and requested another, which defendant submitted on March 19, 2010. This time, defendant estimated the amount of loss to be $116,025 and claimed $116,025. State Auto and defendant completed an inventory of defendant's personal items, which was composed of multiple pages of personal property less than one-year old and listed several expensive items such as a sewing machine, commercial meat slicer, and a DJ mixing table. The inventory did not, however, list any sewing-related materials, like needles, thread, or cloth, and did not include the amplifier necessary for the DJ table to function. Upon further investigation, State Auto found that defendant's reported income in 2009 was only $5,800, while the inventory indicated that defendant had purchased personal property totaling approximately $23,000 within the past year. State Auto's investigation also determined that the fire was intentionally set and that witnesses had seen defendant driving away from her burning home.[7] Because an intentional act was not covered under the policy, State Auto denied defendant's claim. Subsequently, defendant was charged with and convicted of arson of a dwelling house, arson of insured property, and insurance fraud.

> [7]State Auto deposed defendant as part of its investigation; she told State Auto that she left her house on the morning of the fire at 8:50 a.m., contrary to the testimony of her neighbors.

*People v. Pruitt*, No. 313065, 2014 WL 1320253, *1–3.

Following a jury trial in Saginaw County Circuit Court, Pruitt was convicted and sentenced as follows: 30 months to 20 years imprisonment for arson of a dwelling house, 5 months to 10 years for burning insured property, and 17 months to 4 years for insurance fraud. She filed an appeal in the Michigan Court of Appeals and argued that the trial court admitted Row's expert testimony in violation of Michigan Rule of Evidence 702, that her defense counsel was ineffective in failing to object to the admission of Row's testimony, that several offense variables were incorrectly scored, and that the imposition of a crime victim rights assessment violated the Ex Post Facto Clause. The Michigan Court of Appeals affirmed Pruitt's convictions and sentences. *Pruitt*, 2014 WL 1320253 at *10. The Michigan Supreme Court denied leave to appeal. *People v. Pruitt*, 497 Mich. 870 (2014).

5

Pruitt then filed the instant habeas petition. She raises these claims:

I. The trial court plainly erred by allowing the fire investigator to opine on the cause of the fire based on a methodology that has been rejected by the National Fire Prevention Association. Alternatively, counsel rendered ineffective assistance by failing to object.

II. Immaterial statements to firefighters do not implicate the administration of justice. The trial court therefore erred in scoring OV-19 at 10 points.

## STANDARD OF REVIEW

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if she can show that the state court's adjudication of her claims –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). The "unreasonable application" prong of the statute "permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). For

6

a federal court find to a state court's application of Supreme Court precedent "unreasonable," however, "the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Id.* at 520–21 (citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

> Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102–03 (internal quotation marks and citation omitted).

Accordingly, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011). Section 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (quoting *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)).

7

Lastly, a federal habeas court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Id.*

## DISCUSSION

I. <u>Expert Witness Testimony</u>

Pruitt's first claim concerns the admission of David Row's expert testimony. Row concluded that the fire was intentionally set, but Pruitt says he reached his conclusion by process of elimination—also known as "negative corpus"—and the process failed to meet both the admissibility requirements of Michigan Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 508 U.S. 579 (1993). Respondent argues that this claim is procedurally defaulted, not cognizable on federal habeas review, and meritless.

"[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by first addressing the merits of the claim.

The Michigan Court of Appeals described the "negative corpus" analytical approach this way: "[T]he approach provides that after the elimination of any accidental causes of a fire, it is reasonable to infer that the fire was arson." *Pruitt*, 2014 WL 1320253 at *5. The state court acknowledged that negative corpus has been rejected by the National Fire

8

Protection Association because it is "'not consistent with the Scientific Method' and because 'it generates un-testable hypotheses.'" *Id.* (quoting NFPA 921 § 18.6.5 (2011)). The court of appeals held that most of Row's testimony did not violate Michigan Rule of Evidence 702, but his ultimate conclusion that the fire was intentionally set was inadmissible under Rule 702 because it "rested on a combination of negative corpus and a reliance upon circumstantial evidence not within the purview of his qualification as an arson expert." *Id.* Still, the Michigan Court of Appeals held that admission of this testimony did not violate Pruitt's fundamental rights, as there was ample admissible evidence, exclusive of Row's inadmissible testimony, to support the verdicts:

> Row offered admissible testimony that an open flame in the trashcan started the fire. Row also testified that the smoke analysis and witness testimony regarding when defendant left the home allowed for the conclusion that defendant was in the home when the fire started. Multiple witnesses testified that they saw defendant driving away from her home as smoke billowed from the home's eaves – the inference being that defendant was in the home for a somewhat extended period after the fire started. Consistent with these witness statements, defendant told Captain Gotham on the day of the fire that she left home at 9:30 a.m. Later, defendant attempted to dispel the inference that she had been in the home when the fire started by telling State Auto that she left the home at 8:50 a.m. Such arguably false exculpatory statements may be considered as evidence of guilt. *See People v. Seals*, 285 Mich. App. 1, 5-6; 776 N.W.2d 314 (2009).
>
> In addition, just two months before the fire, defendant obtained an insurance policy ensuring the home for $87,000, an amount far in excess of the $9,000 defendant agreed to pay for the home under the land contract, suggesting a motive for arson. Moreover, several expensive non-functioning items, including a commercial meat slicer and sewing machine, were found in defendant's home, likewise suggesting that defendant put them there so that she could collect insurance proceeds from their loss. Indeed, defendant's insurance policy with State Auto insured $60,900 worth of personal property and defendant's personal property inventory indicated that defendant had purchased $23,000 of personal property in the past year, even though defendant had only made about $5,000 in 2009. Finally, Captain Gotham testified that neither the stove nor the refrigerator caused the fire. Thus, the admission of Row's ultimate conclusions regarding the fire did not affect the trial's outcome or otherwise affect

defendant's substantial rights. *Carines*, 460 Mich. at 763.

*Id.* at *6.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68. As a result, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citation omitted). To form a basis for habeas corpus relief, a challenged evidentiary ruling must be so "fundamentally unfair" as to violate due process. *Id*. at 519–20. The Supreme Court has defined "the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Infractions that violate fundamental fairness are restricted to offenses against "'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Bey*, 500 F.3d at 521 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). A petitioner bears the burden of showing that a principle of fundamental fairness has been violated. *Id.*

Pruitt's claim that the admission of Row's testimony violated Michigan Rule of Evidence 702 does not raise a claim cognizable on habeas review. *See Estelle*, 502 U.S. at 67–68. The Court thus turns to the question of whether admission of the portion of Row's testimony that rested on negative corpus violated due process.

Whether the admission of this testimony violated fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor."

*Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (quotation marks and citations omitted). And to evaluate whether a state evidentiary error has resulted in a due process violation, a federal court on habeas review, "consider[s] the strength of the other evidence of guilt." *Hudson v. Lafler*, 421 Fed. App'x 619, 629 (6th Cir. 2011). Inquiries into the sufficiency of the evidence are relevant "in deciding whether the challenged evidence is a crucial or critical factor in the conviction." *Id.*

The Michigan Court of Appeals held that the portion of Row's testimony that was improperly admitted was "extremely limited in scope" and concluded that the other evidence presented was sufficient to support Pruitt's conviction and that she was not denied a fair trial. *Pruitt*, 2014 WL 1320253 at *5. As detailed by the Michigan Court of Appeals, ample evidence supported a finding that Pruitt intentionally set the fire: the timing of the insurance policy purchase, the high-value items found inside Pruitt's home, the huge discrepancy between Pruitt's income and the cost of her recent purchases, Pruitt's inconsistent statements regarding when she left her home on the morning of the fire, and the insurance company's conclusion that the fire was intentionally set. The Court finds that it was not objectively unreasonable for the state court to determine that the admission of Row's testimony about the cause of the fire did not deprive Pruitt of a fair trial.

Additionally, Pruitt's reliance on *Daubert* is misplaced. The Sixth Circuit has held that *Daubert* cannot provide a basis for habeas relief because *Daubert* concerns the Federal Rules of Evidence which are not relevant to a state criminal conviction. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998), *cert. denied*, 525 U.S. 935 (1998). Habeas relief is denied on this claim.

II. <u>Ineffective Assistance of Counsel Claim</u>

In her second claim for habeas relief, Pruitt argues that her trial counsel was ineffective for failing to object to the expert witness's testimony that the fire was intentionally set. The Michigan Court of Appeals held that counsel's failure to object to admission of Row's ultimate conclusions regarding the fire fell below an objective standard of reasonableness. *Pruitt*, 2014 WL 1320253 at *7. The Michigan Court of Appeals held, however, that Pruitt was not prejudiced by counsel's failure because no reasonable likelihood existed that, but for counsel's error, the outcome of the trial would have been different. *Id.*

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). The standard for obtaining relief is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). Accordingly, "the question is not whether counsel's actions were reasonable"; but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. In order to establish prejudice, a petitioner must show that, but

12

for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

The Michigan Court of Appeals' decision that Pruitt failed to establish prejudice is not an unreasonable determination of the facts or an unreasonable application of *Strickland*. As discussed in detail above, even if Row had not been allowed to testify as to his ultimate conclusion regarding the fire, ample evidence supported a finding that Pruitt intentionally set the fire. Habeas relief is not warranted on this claim.

III.   Scoring of Offense Variable 19

Pruitt's final claim for habeas corpus relief concerns the scoring of offense variable (OV) 19. Ten points were scored for OV 19 based upon Pruitt's allegedly false statements to the fire captain and the insurance company. Offense variable 19 provides for the scoring of ten points when an offender "interfered with or attempted to interfere with the administration of justice." Mich. Comp. Laws § 777.49. The Michigan Court of Appeals held that the fire captain was a law enforcement officer involved in the investigation of a crime and therefore the trial court properly scored OV19 at ten points. *Pruitt*, 2014 WL 1320253 at *9.

Petitioner's argument that the state court erred in scoring her sentencing guidelines is based solely on the state court's interpretation of state law. It does not implicate any federal rights. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law."). "[A] claim that the trial court mis-scored offense variables in determining the state sentencing

13

guidelines is not cognizable on habeas corpus review." *Adams v. Burt*, 471 F. Supp. 2d 835, 844 (E.D. Mich. 2007). Habeas relief will be denied.

IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court concludes that reasonable jurists would not debate the Court's conclusion that none of the claims in the habeas petition warrant relief. Therefore, the Court will deny a certificate of appealability.

**CONCLUSION**

**WHEREFORE**, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**SO ORDERED.**

Dated: May 23, 2017        s/Stephen J. Murphy, III
                           STEPHEN J. MURPHY, III
                           United States District Judge

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 25, 2017, by electronic and/or ordinary mail.

                                        <u>s/David P. Parker</u>
                                        DAVID P. PARKER
                                        Case Manager